Filed 4/19/21  Heinz v. Cal. Public Employees' Retirement System CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| BRADLEY HEINZ et al., | B300089 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC664844 and BS169444) |
| v. | |
| CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment and an order of the Superior Court of Los Angeles County, Amy D. Hogue, Judge.  The judgment of dismissal is reversed.  The order denying the petition for writ of administrative mandamus is affirmed.

Law Offices of John Michael Jensen and John Michael Jensen for Plaintiff and Appellant.

Reed Smith, Raymond A. Cardozo, Amir Shlesinger and Todd Kim for Defendants and Respondents.

————————————

Bradley Heinz, a former state employee, on behalf of himself and a putative class of individuals enrolled in preferred provider organization (PPO) health insurance offered or administered by the California Public Employees' Retirement System and its Board of Administration (collectively CalPERS) and BlueCross of California dba Anthem Blue Cross (Anthem), sued CalPERS and Anthem alleging they had falsely represented the methodology for calculating reimbursements for costs incurred when seeing a nonpreferred (out-of-network) healthcare provider for nonemergency services and failed to properly reimburse their members for those costs. As part of his lawsuit Heinz also petitioned for a writ of administrative mandamus under Code of Civil Procedure section 1094.5 to overturn CalPERS's rejection of his requests for additional reimbursement for out-of-network services provided to him in 2008 and 2009.

The trial court denied the writ petition and thereafter sustained CalPERS and Anthem's demurrer to Heinz's first amended complaint without leave to amend, entering judgment on their behalf. The court ruled the adverse administrative decision and order denying Heinz's writ petition precluded his contract and tort causes of action and, to the extent any cause of action alleged claims separate from those presented in the administrative proceeding, they were time-barred.

We affirm the trial court's order denying the petition for writ of administrative mandamus but reverse the judgment dismissing the action and remand with directions to enter a new

2

order sustaining in part and overruling in part the demurrer to the first amended complaint.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *CalPERS Health Plans*

In addition to administering the retirement system for employees of the State of California and other public entities, CalPERS, a unit of the Government Operations Agency (Gov. Code, § 20002), offers its members PPO and other types of managed care health plans as required by the Public Employees' Medical and Hospital Care Act (Gov. Code, § 22750 et seq.). CalPERS contracts with Anthem to administer its PPO plans: PERSCare, PERS Choice and PERS Select.

The evidence of coverage (EOC) establishes the terms and conditions of coverage and governs a health plan's obligations to its members and their dependents. (Health & Saf. Code, § 1345, subd. (d) ["'[e]vidence of coverage' means any certificate, agreement, contract, brochure, or letter of entitlement issued to a subscriber or enrollee setting forth the coverage to which the subscriber or enrollee is entitled"].) The EOC's contents are regulated by the Department of Managed Health Care. (Cal. Code Regs., tit. 28, § 1300.63.1.)

Reimbursement for services under PPO plans differs depending on whether members use in-network (preferred) providers or out-of-network (nonpreferred) providers. In-network providers have contracts with Anthem to accept its payment for services, plus any applicable member deductible and copayment, as payment in full for covered services. Out-of-network providers have no contract with Anthem.

Reimbursements are structured to encourage members to seek services from in-network preferred providers. In general, a

3

member's copayment responsibility for any particular healthcare service is a higher percentage of the "Allowable Amount" for out-of-network providers (40 percent) than for in-network providers (10 percent or 20 percent, depending on the service and the plan).[1]

Plan members are not responsible to pay preferred providers any amounts above the approved Allowable Amount. In contrast, as stated in the EOC's for the 2008 PERSCare plan and the 2009 PERS Choice plan, at issue in this case, "The Allowable Amount for covered services provided by Non-Preferred Providers is usually lower than what they customarily charge. . . . Non-Preferred Providers may bill the Member for the difference between the Allowable Amount and the Non-Preferred Provider's billed charges in addition to applicable Member deductibles and copayments."

The definition section of the 2008 PERSCare and 2009 PERS Choice EOC's provide the Allowable Amount for a service will be the lesser of the provider's billed charge or Anthem's allowance, defined as, "1. [T]he amount that [Anthem] has determined is an appropriate payment for the services(s) rendered in the provider's geographic area, based on such factors as the Plan's evaluation of the value of the service(s) relative to the value of other services, market considerations, and provider charge patterns; or [¶] 2. [S]uch other amount as the Preferred Provider and [Anthem] have agreed will be accepted as payment for the service(s) rendered; or [¶] 3. [I]f an amount is not determined as described in either (1) or (2) above, the amount

---

[1]     For some services plan members pay a fixed (typically $20) copay for treatment by a preferred provider, rather than a percentage of the Allowable Amount.

4

that [Anthem] determines is appropriate considering the particular circumstances and the services rendered."  That is, the Allowable Amount is the usual, customary and reasonable (UCR) rate, a recognized method for determining health care prices (option one); the contracted rate (option two); or the amount Anthem determines in its discretion is appropriate (option three).

2. *Heinz's Reimbursed Amounts for Out-of-network Services*

Heinz was enrolled in the PERSCare PPO from 2006 through 2008 and the PERS Choice PPO from 2009 through 2014.  Heinz received treatment from Dr. Joe A. Walker, a psychiatrist, for nonemergency healthcare services on a regular basis between 2006 and 2015.

Before May 2008 Dr. Walker was a member of a medical group and under contract with Anthem as a preferred provider.  As of April 2008 Dr. Walker billed $420 for a 50-minute visit.  Anthem had approved a contract payment rate for Dr. Walker of $299.57 per visit (the Allowable Amount).  Heinz made a relatively small ($20) copayment to Dr. Walker, and Anthem paid Dr. Walker the balance of the contract rate.

In May 2008 Dr. Walker terminated his affiliation with the medical group with which he had been practicing and ceased to contract with Anthem as a preferred provider.  Dr. Walker continued to state his hourly rate was $420, but billed Heinz $250 per visit, which he subsequently increased to $275 per visit.  Anthem reimbursed Heinz for seeing Dr. Walker as an out-of-network provider at the rate of 60 percent of the Allowable Amount, which it reduced from $299.57 per visit to $113.31 per visit for the period from May 2008 through 2009.  Anthem thus paid approximately $68 per visit; Heinz was responsible for the balance of $182 per visit.

5

### 3. *Heinz Pursues Anthem's and CalPERS's Administrative Review Process*

Anthem issued Heinz his first explanation of benefits form for treatment by Dr. Walker as an out-of-network provider on September 24, 2008, covering visits in May 2008. Dissatisfied with the reduced reimbursement he received, Heinz on September 25, 2008 submitted a member grievance form to Anthem in accordance with its prescribed process for reviewing claims. Heinz contended, under the EOC, the Allowable Amount for Dr. Walker's treatment should be the customary and reasonable amount for the services provided. Anthem denied Heinz's claims for additional reimbursement, which had been expanded through additional grievance filings to include billings and reimbursements through 2009.[2]

After exhausting Anthem's internal grievance and appeals process, on June 15, 2009 Heinz appealed the reimbursement issue to CalPERS. Throughout the appeal process Heinz, now represented by counsel, asserted (through "amended appeals" and in his trial and posttrial briefs) arguments beyond the specific issue of the amount of reimbursement for his 2008 and 2009 visits with Dr. Walker, contending denial of out-of-network reimbursements based on the methodology being used violated constitutional, statutory and regulatory requirements governing CalPERS and Anthem.[3] CalPERS staff advised Heinz he could

---

[2] In addition to his September 25, 2008 grievance, Heinz filed grievances on November 8, 2008, January 12, 2009, March 17, 2009 and July 7, 2009.

[3] As discussed, notwithstanding his dissatisfaction with Anthem's methodology for reimbursement of members' out-of-network nonemergency healthcare services, Heinz reenrolled in

6

not raise claims other than the specific issue of reimbursement presented to Anthem by his 2008 and 2009 grievances.

Heinz requested a formal hearing before an administrative law judge from the Office of Administrative Hearings following CalPERS's administrative denial of his claims for additional reimbursements (commonly referred to as a "paper review"). The statement of issues prepared by CalPERS staff and filed pursuant to Government Code section 11504 stated only calculation of 2008 and 2009 reimbursements was at issue and the only question presented was whether Anthem had complied with the terms of the applicable EOC's.[4] At the hearing, where Heinz again attempted to broaden the scope of the proceedings, the administrative law judge ruled Heinz could not expand the issues beyond those he had presented to Anthem.

The administrative law judge's February 3, 2017 proposed decision rejected Heinz's claims for greater reimbursement, finding Anthem had complied with the terms of the EOC in determining the Allowable Amount for Dr. Walker's services. The judge relied in part on the 2014 decision in *Orthopedic Specialists of Southern California v. Public Employees' Retirement System* (2014) 228 Cal.App.4th 644 (*Orthopedic Specialists*), which held no contractual or other requirement

---

PERS Choice from 2010 through 2014 and continued to submit claims for his therapy sessions with Dr. Walker. The EOC's remained essentially unchanged during those years.

[4]     According to the statement of issues, "The issue to be resolved is whether Anthem Blue Cross complied with the terms of the EOC in denying respondent Heinz's request for additional reimbursement for services rendered by a Non-Preferred Provider."

obligated CalPERS to pay out-of-network providers of nonemergency services at a usual and customary rate. Rather, the EOC, which governs the issue of payment for nonemergency services by out-of-network providers, "clearly states that an out-of-network provider will be paid 60 percent of the Allowable Amount, which is broadly defined as the amount Anthem 'has determined is an appropriate payment' for the services rendered." (*Id*. at p. 648.) The CalPERS Board adopted the administrative law judge's proposed decision and thereafter denied Heinz's request for reconsideration.

On April 21, 2017, following CalPERS's adoption of the administrative law judge's proposed decision, Heinz filed a 135-page claim under the Government Claims Act on behalf of himself and a class of CalPERS members who had purchased PPO insurance between 2008 and 2014, which is, in substance, a precursor to the complaint he filed in superior court less than two months later. The Government Claims Program rejected the claim on May 18, 2017, stating it had no jurisdiction to consider the claim because it had been presented more than one year after the date the alleged damages accrued.

4. *Heinz's Lawsuit*

Heinz filed a putative class action complaint on June 13, 2017 alleging causes of action for breach of contract, breach of fiduciary duties, misrepresentation, unfair business practices and violation of statutory duties and requesting a writ of administrative mandamus against CalPERS to overturn its decision rejecting his claims for additional reimbursement. Although Heinz alleged a wide variety of wrongful acts by CalPERS and Anthem, two theories principally animated the lawsuit: (1) The promotional materials used to encourage

8

CalPERS members to enroll in Anthem's PPO health plans,[5] as well as portions of the EOC itself (including a "payment example"),[6] while clearly stating reimbursement for use of out-of-network providers for nonemergency services would be at a lower percentage than for in-network providers, falsely indicated the base Allowable Amount for services would be identical for in-network and out-of-network providers; and (2) the definition of Allowable Amount in the EOC that purports to give Anthem unfettered discretion to set the Allowable Amount for out-of-network providers without regard to the UCR rate, prevailing standards or the rate at which in-network providers have contracted is unlawful.

> 5. *The Order Staying All Claims Other than Heinz's Petition for Administrative Mandamus*

On May 7, 2018, following briefing on Heinz's petition for relief from his late filing of claims under the Government Claims Act,[7] the trial court ruled Heinz could not maintain claims other than his request for administrative mandamus "unless and until

---

[5] The 2008 Health Program Guide, attached as exhibit 52 to Heinz's complaint, for example, states, "A PPO is similar to a traditional 'fee-for-service' plan, but you must use doctors in the PPO provider network or pay higher co-insurance (percentage of charges)."

[6] The payment example from the EOC for the 2008 PERSCare plan, part of exhibit 24 to Heinz's complaint, is attached as an appendix to this opinion.

[7] Concurrently with the filing of his putative class action complaint, Heinz filed a petition for relief from the late filing of his claims under the Government Claims Act. The two actions were found to be related, and the class action designated the lead case.

he prevails in his writ proceeding." Accordingly, the court stayed all claims in the action except for Heinz's request for administrative mandamus, pending resolution of that matter.

In its ruling the court (Hon. John Shepard Wiley Jr.) also addressed whether Heinz was required to present a claim for damages before filing suit and the issue of tolling or estoppel. As to the latter issue, the court stated, "CalPERS incorrectly argues Heinz's pursuit of administrative remedies did not toll the statute of limitations on his claims. . . . [W]hen a plaintiff pursues relief on a claim in one forum, the statute of limitations does not run in another forum. [Citation.] Equitable tolling applies when the plaintiff's filing in the first forum gives the defendant timely notice of the claim, the defendant suffered no prejudice in its ability to gather evidence to defend against the second claim, and the plaintiff acted reasonably and in good faith in filing the second claim. [Citation.] Heinz diligently pursued relief via CalPERS's Board of Administration. The pendency of that action tolled the statute of limitations on his claims. [¶] . . . To the extent Heinz has any claims remaining after resolution of his request for administrative mandamus, his exhaustion of administrative remedies tolled the statute of limitations on those claims, even if the statute of limitations otherwise would have elapsed."

At the hearing counsel for CalPERS and Anthem expressed its agreement with the court's tentative ruling at a "global" level, but said he disagreed with some specifics of the court's analysis of equitable tolling.[8] In response, after noting its comments were on

---

[8] Referring to the tentative ruling on equitable tolling, counsel stated, "It may be correct in some of the senses of this case, but I think it's too blunt of a ruling for how detailed this

10

the record, the court stated CalPERS and Anthem could contest application of equitable tolling in more detail at a later point in the case without it being considered a motion for reconsideration.

6. *Denial of the Petition for Writ of Administrative Mandamus*

In support of his petition for writ of administrative mandamus Heinz argued CalPERS had misapplied the contract definition of Allowable Amount as provided in the EOC's for his 2008 and 2009 plans (that is, Anthem incorrectly calculated the Allowable Amount) and, if Anthem was allowed to determine Allowable Amount in its discretion, CalPERS's delegation of that authority to Anthem breached its fiduciary duty to him as a member. Heinz also moved to augment the administrative record to include excerpts from CalPERS's contract with Anthem for the PPO plans at issue, which Heinz obtained during discovery in the superior court. CalPERS and Anthem opposed the motion to augment on the grounds the material was irrelevant and Heinz had failed to show diligence in attempting to obtain it for use during the administrative hearing.

Following additional briefing the trial court (Hon. Amy D. Hogue) denied both the motion to augment and the petition for writ of administrative mandamus. As to the motion to augment, the court found the CalPERS-Anthem contract was not relevant to the issue adjudicated in the administrative proceeding. With respect to the petition the court first ruled, contrary to Heinz's contention the administrative law judge improperly addressed a "strawman argument," the administrative record showed Heinz

---

case is and how many causes of action it has and how different they are."

11

had argued in his trial brief and at the hearing that Anthem and CalPERS improperly reduced the Allowable Amount for Dr. Walker's services below the usual, customary, reasonable allowed amount. Accordingly, it was entirely proper for the administrative law judge to consider that argument and to rely on *Orthopedic Specialists*, *supra*, 228 Cal.App.4th 644, to reject Heinz's contention Anthem was required to set the Allowable Amount for Dr. Walker's services at the UCR rate.

The court further found Heinz had failed to demonstrate the administrative decision was based on an error of law or not supported by substantial evidence, as required for issuance of the writ of administrative mandamus. Emphasizing the payment example in the EOC, which used the same Allowable Amount figure to illustrate the difference between reimbursement for in-network and out-of-network providers, expressly stated, "Note: This is only an example. Allowable amount varies according to procedure and provider of service," the court ruled the payment example could not reasonably be interpreted as a promise to ensure that the Allowable Amount will always be the same for the two types of providers.[9]

The court agreed with Heinz that, when applying the definition of Allowable Amount in the EOC, Anthem could use the third option, which authorized Anthem to determine the appropriate amount to be paid "considering the particular circumstances and the services rendered," only if it has not already determined an Allowable Amount using the first option (the UCR rate) or the second option (a contracted amount). But,

---

[9] The court reprinted in its order denying the petition a copy of the payment example from the 2008 PERSCare EOC, which we have attached as an appendix to this opinion.

12

the court continued, Heinz failed to cite any evidence in the administrative record demonstrating Anthem violated that requirement. Specifically, there was no evidence Anthem had determined a UCR rate for services rendered in the applicable market but chose to disregard it or breached an agreement with Dr. Walker to pay a particular rate. Moreover, because the EOC authorizes Anthem to determine an appropriate Allowable Amount for out-of-network providers for nonemergency services under these circumstances, absent evidence of bad faith, there is no breach of the implied covenant of good faith and fair dealing. Again, the court found, Heinz had failed to point to any evidence in the record that would establish bad faith.

The court rejected Heinz's final argument that CalPERS breached its fiduciary duty to its members by giving Anthem unlimited discretion to determine Allowable Amounts without reaching the merits. This claim, the court explained, was not part of the administrative appeal and not properly presented in the writ proceeding. To the extent it is part of Heinz's lawsuit, the court concluded, it was stayed by the court's earlier order.

Heinz sought immediate appellate review of the decision denying his petition for writ of administrative mandamus by filing a notice of appeal and a petition for writ of mandate. This court dismissed the appeal as premature and summarily denied the petition for writ of mandate.

7. *The Order Sustaining the Demurrer to the First Amended Complaint*

After the court denied Heinz's petition for writ of administrative mandamus, CalPERS and Anthem demurred to the remaining causes of action in the original complaint. Prior to the hearing date, Heinz filed a first amended complaint, largely

13

reiterating the claims in his original complaint based on his central allegation that CalPERS and Anthem inappropriately reduced reimbursements for out-of-network nonemergency services under the PPO coverages offered, while adding several new legal theories to his pleading.[10]  The amended complaint asserted claims covering the period from 2008 through 2014. CalPERS and Anthem again demurred, arguing all of Heinz's claims were precluded by the now-final administrative decision rejecting his requests for additional reimbursements and, alternatively, were barred by the applicable statutes of limitations and the Government Claims Act.[11]

---

[10]     In his first amended complaint Heinz alleged causes of action against both CalPERS and Anthem labeled breach of contract, breach of the implied covenant of good faith and fair dealing, misrepresentation, unfair business practices, unjust enrichment, violation of statutory duties and violation of due process.  Heinz asserted a cause of action for breach of fiduciary duty against CalPERS and sought a traditional writ of mandate pursuant to Code of Civil Procedure section 1085 to compel it to perform its legal duties.  He sought damages, equitable relief (including an accounting) and attorney fees.  Heinz deleted the cause of action seeking a writ of administrative mandamus.

[11]     In addition to the three grounds for demurrer directed to the entire first amended complaint, CalPERS demurred to the cause of action for breach of fiduciary duty on the ground it has immunity for the discretionary acts challenged by Heinz. CalPERS and Anthem demurred to the cause of action for misrepresentation as failing to meet applicable heightened pleading requirements and to the cause of action for violation of due process on the grounds there is no right to pursue a damage claim for a due process violation in California and, in any event, it was apparent from the face of the complaint that Heinz had received all the process he was due.

14

The court sustained the demurrer to the first amended complaint without leave to amend in a nine-page order filed July 26, 2019. The court explained under *Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 76, adverse findings made in a quasi-judicial administrative proceeding, unless set aside through judicial review procedures (that is, by a petition for writ of administrative mandamus), have binding effect on further claims asserted by the plaintiff. Because Heinz did not prevail in his writ petition, the court ruled, "the CalPERS board's decision is final and 'has issue and claim preclusive effect,'" as to all of Heinz's remaining causes of action. The court rejected Heinz's argument his first amended complaint alleged causes of action that arose from facts and law different from those adjudicated by CalPERS, reasoning the allegations in the first amended complaint "are the same allegations that were at issue in the administrative proceeding and in Plaintiff's petition for writ of mandate." The court provided as an example Heinz's claims for breach of contract and breach of the implied covenant of good faith and fair dealing based on Anthem's inadequate reimbursement for out-of-network services.

The court alternatively ruled, even if Heinz could show that the issues raised in his remaining causes of action were separate from the issues raised during the administrative proceeding, all the remaining causes of action would be barred by the applicable three- or four-year statutes of limitations because Heinz alleged CalPERS and Anthem failed to properly reimburse him in 2008 and 2009 but did not file his complaint until 2017. The court noted Judge Wiley's earlier tentative ruling on equitable tolling but, citing the reporter's transcript from the May 7, 2018 hearing, stated the issue had expressly been left open for further

15

consideration. The court then ruled equitable tolling did not apply. To establish equitable tolling, the court explained, the plaintiff must demonstrate timely notice to the defendant in filing the first claim, as well as lack of prejudice to the defendant in gathering evidence to defend against the second claim and good faith and reasonable conduct by the plaintiff in filing the second claim. While Heinz's administrative action provided timely notice to CalPERS and Anthem of all claims or issues raised in that action, the court ruled, to the extent his first amended complaint asserted claims not raised in the administrative proceedings, he did not provide timely notice.

Judgment in favor of CalPERS and Anthem was entered on August 23, 2019. Heinz filed a premature notice of appeal on August 21, 2019 from the court's nonappealable July 26, 2019 order sustaining the demurrer without leave to amend (see *Vibert v. Berger* (1966) 64 Cal.2d 65, 67), which we treat as timely pursuant to California Rules of Court, rule 8.104(d)(2).

## DISCUSSION

1. *Standard of Review*

    a. *Petition for writ of administrative mandamus*

Code of Civil Procedure section 1094.5,[12] the administrative mandamus statute, provides for judicial review of administrative orders or decisions. (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514.) The question presented by a petition for writ of administrative mandate is whether the agency or tribunal that issued the decision being challenged "proceeded without, or in excess of, jurisdiction;

---

[12] Statutory references are to this code unless otherwise stated.

16

whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (§ 1094.5, subd. (b).) "Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*)

On appeal from the judgment on a petition for writ of administrative mandate in a case not involving fundamental vested rights, as here, we review the agency's findings, not the superior court's decision, for substantial evidence. (*Doe v. University of Southern California* (2018) 28 Cal.App.5th 26, 34; *Benetatos v. City of Los Angeles* (2015) 235 Cal.App.4th 1270, 1281; see § 1094.5, subd. (c) ["abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record"].) The petitioner in the administrative mandamus proceeding "has the burden of proving that the agency's decision was invalid and should be set aside, because it is presumed that the agency regularly performed its official duty." (*Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 335.)

As all parties agree, absent any conflict in extrinsic evidence, we review de novo issues regarding the proper interpretation of a contract, here the EOC. (See *City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395; *Garcia v. Truck Ins. Exchange* (1984) 36 Cal.3d 426, 439 ["[i]t is solely a judicial function to interpret a written contract unless the interpretation turns upon the credibility of extrinsic evidence, even when conflicting inferences may be drawn from uncontroverted evidence"]; *Hanna v. Mercedes-Benz USA, LLC* (2019) 36 Cal.App.5th 493, 507 ["in the absence of any conflict in

17

extrinsic evidence presented to clarify an ambiguity," written agreements are interpreted de novo]; see also *Chaplin v. State Personnel Board* (2020) 54 Cal.App.5th 1104, 1114 ["[w]hen an 'appeal from the administrative mandamus proceeding presents questions of law, our review is de novo'"].)

b. *Demurrer*

"In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory." (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162.) "In making this determination, we must accept the facts pleaded as true and give the complaint a reasonable interpretation." (*Mathews v. Becerra* (2019) 8 Cal.5th 756, 762; accord, *Summer J. v. United States Baseball Federation* (2020) 45 Cal.App.5th 261, 268.)

2. *The Superior Court Properly Denied the Petition for Writ of Administrative Mandamus*

The sole issue pursued by Heinz through the full Anthem and CalPERS administrative grievance and appeal process was whether Anthem had complied with the terms of the applicable EOC when reimbursing Heinz for his 2008 and 2009 out-of-network treatment by Dr. Walker. That question, in turn, depends on the proper interpretation of the term "Allowable Amount" as applied to out-of-network providers of nonemergency services.

The text of the EOC's (identical for Heinz's 2008 PERSCare and 2009 PERS Choice plans) is unambiguous. (See Civ. Code, § 1638 ["[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity"].) For covered services performed by out-of-

18

network physicians or other health care providers, reimbursement is 60 percent of the Allowable Amount, which is defined for nonpreferred providers as either the UCR rate determined by Anthem for the provider's geographic area (option 1) or, when no UCR rate has been determined, the amount Anthem decides "is appropriate considering the particular circumstances and services rendered" (option 3).[13] Reasonably read, option 3 when applicable gives Anthem discretion to set the Allowable Amount at whatever figure it deems proper under the particular circumstances presented.  (See *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 ["[i]f contractual language is clear and explicit, it governs"]; accord, *State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 195.)[14]

Our colleagues in Division Two of this court reached the same conclusion in *Orthopedic Specialists*, *supra*, 228 Cal.App.4th 644, in which an out-of-network medical provider had contended Anthem and CalPERS were obligated to pay it the UCR rate for nonemergency orthopedic services.  The court affirmed the trial court's order dismissing the provider's lawsuit after sustaining a demurrer without leave to amend.  As the court explained (and the provider had acknowledged), pursuant to governing regulations (Cal. Code Regs., tit. 28,

---

[13]    For preferred providers the Allowable Amount is the contracted rate—that is, the amount that has been "agreed will be accepted as payment for the service(s) rendered."

[14]    Anthem will determine the Allowable Amount for certain procedures to be performed by an out-of-network provider and notify the plan member and his or her physician in advance of treatment.

19

§ 1300.71, subd. (a)(3)(C)), payment for nonemergency services provided by out-of-network providers to PPO enrollees is "'the amount set forth in the enrollee's Evidence of Coverage.'" (See *Orthopedic Specialists*, at p. 648.) Turning to the EOC at issue (the PERS Choice EOC), the court held it "clearly states that an out-of-network provider will be paid 60 percent of the Allowable Amount, which is broadly defined as the amount Anthem 'has determined is an appropriate payment' for the services rendered." (*Ibid*.) In response to the argument the option 3 contract language essentially allowed Anthem to pay out-of-network providers whatever it deemed proper, without restriction, the court responded, "[I]t is correct that the EOC allows Anthem itself to determine what is an appropriate amount to pay an out-of-network provider for nonemergency services. But just because [the provider] believes that the EOC's provisions are unfair does not mean the provisions can be ignored or that they are unenforceable. The contract says what it says." (*Ibid*.)[15]

Heinz urges us not to follow *Orthopedic Specialists*, arguing, unlike the provider in that case, he is seeking a greater reimbursement based on the contract considered as a whole, not the UCR rate considered in the abstract. He also suggests, without further elaboration, his status as a CalPERS member and, therefore, beneficiary of its fiduciary obligations, somehow

---

[15] The court of appeal also rejected the provider's argument that, notwithstanding governing regulations and the EOC, an implied promise existed it would be paid the UCR rate "because, as the trial court correctly noted, an oral promise cannot be enforced against a government agency, like CalPERS." (*Orthopedic Specialists*, *supra*, 228 Cal.App.4th at p. 649.)

impacts the issue of contract interpretation. Neither point is persuasive.

Heinz's contract-as-a-whole argument is premised on his contention the EOC represented the Allowable Amount would be the same for preferred and nonpreferred providers, with reimbursement differing only as to the percentage that would be applied to the common base amount. He relies primarily on the payment example in the EOC, which, as discussed, used the same Allowable Amount figure to illustrate the difference between reimbursement for in-network and out-of-network providers.[16] However, as the trial court emphasized in its ruling denying the writ petition, the schedule specifically notes, "This is only an example. Allowable amount varies according to procedure and provider of service." More significantly, in defining the Allowable Amount, the payment example specifically directs the member to "see definition on page 91"—the three-subpart definition of the term we previously quoted. Far from creating a ground for distinguishing *Orthopedic Specialists*, the payment example thus reinforces that court's reliance on the EOC's definition of Allowable Amount, and specifically the language of option 3, to reject a claim for greater reimbursement for out-of-network providers.

_____

[16] Heinz also points to other pages in the EOC's summarizing the plans and describing medical and hospital benefits that explain various services will be reimbursed at 90 percent (for 2008 PERSCare) or 80 percent (for 2009 PERS Choice) when the member sees a preferred provider but at 60 percent for nonpreferred providers without disclosing there will be any change or reduction in the Allowable Amount used to calculate reimbursements. In fact, Allowable Amount is not mentioned at all in those portions of the EOC's.

Heinz also argues the three subparts of the Allowable Amount definition should be construed to be substantially the same: The contract rate (option 2) should be the same as, or at least similar to, the usual market rate (option 1), which should be the same or similar to the appropriate rate under the circumstances for the service provider (option 3). It would be unreasonable, Heinz contends, to interpret the third subpart, as did the court of appeal in *Orthopedic Specialist* and the trial court in the case at bar, to give Anthem and CalPERS the right to determine the reimbursement without any reference to objective standards.

Heinz's argument is nonsensical. The purpose of a PPO plan administrator negotiating rates for preferred providers is to control (that is, to reduce) the cost of medical care. Necessarily that means in virtually all instances the contracted rate will be less than the UCR rate (and also less than the provider's usual billing rate). And the prerequisite for use of option 3 is that Anthem has not determined a UCR rate for the nonpreferred provider's services, so there is no rate that is "the same or similar as" to apply. His argument also runs afoul of the well-established presumption against surplusage. (See *Wind Dancer Production Group v. Walt Disney Pictures* (2017) 10 Cal.App.5th 56, 70; *In re Tobacco Cases I* (2010) 186 Cal.App.4th 42, 49; see also Civ. Code, § 1641.)

Nor is there any support in the definition of Allowable Amount (or elsewhere in the EOC) for Heinz's additional argument that use of the adjective "appropriate" in option 3 ("the amount [Anthem] determines is appropriate") required Anthem to employ an independent and objective standard in setting the Allowable Amount for Dr. Walker's therapy sessions. In this

context, "appropriate" simply means suitable or right for the occasion.  (See, e.g., Merriam-Webster Dict. Online (2021) [defining "appropriate" as "especially suitable or compatible: FITTING"]) <https://www.merriam-webster.com/dictionary/appropriate> [as of Apr. 19, 2021], archived at <https://perma.cc/5MJK-Z29H>; Cambridge Dict. Online (2021) [defining "appropriate" as "suitable or right for a particular situation or occasion"] <https://dictionary.cambridge.org/us/dictionary/english/appropriate> [as of Apr. 19, 2021], archived at <https://perma.cc/UG4W-7EFW>; see generally Civ. Code, § 1644 ["[t]he words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed"].)  When setting the Allowable Amount under option 3, Anthem was required to consider the particular circumstances of the out-of-network services and provider, which certainly could include looking at objective standards or criteria. But it was not obligated to do so.

Of course, as Heinz argues, his EOC's, like every contract, included an implied covenant of good faith and fair dealing.  (See generally *Kransco v. American Empire Surplus Lines Ins. Co.* (2000) 23 Cal.4th 390, 400 [every contract contains an implied covenant of good faith and fair dealing that "'neither party will do anything which will injure the right of the other to receive the benefits of the agreement'"].)  The implied covenant "finds particular application in situations where one party is invested with a discretionary power affecting the rights of another.  Such power must be exercised in good faith."  (*Carma Developers*

(*Cal.*), *Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 372 (*Carma Developers*); accord, *Ladd v. Warner Bros. Entertainment, Inc.* (2010) 184 Cal.App.4th 1298, 1306-1307.)

Although breach of a specific provision of the contract is not a prerequisite to a claim of breach of the implied covenant of good faith and fair dealing (*Carma Developers*, *supra*, 2 Cal.4th at p. 373), such a claim "must show that the conduct of the defendant, whether or not it also constitutes a breach of a consensual contract term, demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement."  (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1395; accord, *Mosely v. Pacific Specialty Ins. Co.* (2020) 49 Cal.App.5th 417, 436; *Nieto v. Blue Shield of California Life & Health Ins. Co.* (2010) 181 Cal.App.4th 60, 86; *Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 346.)

As the superior court explained in ruling Heinz had not established grounds for issuance of a writ of mandate, Heinz failed to cite any evidence in the administrative record that Anthem had acted in bad faith in setting an Allowable Amount for Dr. Walker as an out-of-network provider that was lower than his in-network contract rate had been.  To the contrary, doing so was consistent with Anthem and CalPERS's clearly stated goal of providing members insurance coverage for healthcare services

while controlling the overall costs of the program. Heinz's briefing on appeal does not remedy that fatal deficiency.[17]

   3. *The Superior Court Did Not Abuse Its Discretion in Denying the Motion To Augment the Administrative Record*

In the superior court Heinz sought to augment the administrative record with portions of the contract between Anthem and CalPERS, discovered by Heinz after the administrative process had been completed and his lawsuit filed, that detailed financial incentives provided by CalPERS to Anthem to control costs in administering the PPO programs. As

_____

[17] In support of his petition for a writ of administrative mandamus in the superior court, Heinz asserted Anthem had breached the terms of the 2008 and 2009 EOC's, not that the relevant portions of the EOC's were unenforceable. Accordingly, his arguments that a provision in an insurance policy that takes away or limits coverage reasonably expected by the insured must be "conspicuous, plain and clear" to be enforceable; the third subpart of the Allowable Amount definition, as interpreted by Anthem, is unconscionable; and the discretion given to Anthem to set the Allowable Amount for nonpreferred providers at whatever level it deems proper makes its promise to reimburse for out-of-network services illusory; as well as his claim the EOC's provisions for out-of-network reimbursement violate various statutes and regulations, are not properly presented on appeal from the superior court's denial of his petition. (See *Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 603 ["'issues not raised in the trial court cannot be raised for the first time on appeal'"]; *Krechuniak v. Noorzoy* (2017) 11 Cal.App.5th 713, 750 ["the general rule" that a party may not raise a new theory on appeal "is especially true when the theory newly presented involves controverted questions of fact or mixed questions of law and fact"].)

discussed, the superior court denied the motion, ruling the material was not relevant.

"'The general rule is that a hearing on a writ of administrative mandamus is conducted solely on the record of the proceeding before the administrative agency. [Citation.]' [Citation.] Augmentation of the administrative record is permitted only within the strict limits set forth in section 1094.5, subdivision (e)." (*Pomona Valley Hospital Medical Center v. Superior Court* (1997) 55 Cal.App.4th 93, 101; accord, *Smith v. Selma Community Hospital* (2008) 164 Cal.App.4th 1478, 1520.) Section 1094.5, subdivision (e), provides, "Where the court finds that there is relevant evidence that, in the exercise of reasonable diligence, could not have been produced or that was improperly excluded at the hearing before respondent, . . . in cases in which the court is authorized by law to exercise its independent judgment on the evidence, the court may admit the evidence at the hearing on the writ without remanding the case." "Determination of the question of whether one of the exceptions [identified in section 1094.5, subdivision (e)], applies is within the discretion of the trial court, and the exercise of that discretion will not be disturbed unless it is manifestly abused." (*Pomona Valley Hospital Medical Center*, at p. 101.)

The issue presented to the administrative law judge and the CalPERS Board, and subsequently in Heinz's section 1094.5 writ petition, was whether Anthem had breached the terms of the governing EOC's by improperly determining the Allowable Amount for Dr. Walker's out-of-network services and, as a result, incorrectly calculated the reimbursements due Heinz. It was well within the trial court's broad discretion to conclude any economic incentive Anthem might have to reduce overall costs in the PPO

26

plans it administered for CalPERS was not relevant to the court's determination of those limited questions of contract interpretation and compliance. (See *McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 295-296 [trial court's discretion "is particularly broad 'with respect to rulings that turn on the relevance of the proffered evidence'"]; *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281 [same].)

4. *The Trial Court Erred in Sustaining the Demurrer to All Causes of Action in the First Amended Complaint*

a. *The preclusive effect of the administrative findings*

i. Claim preclusion

"Generally speaking, if a complainant fails to overturn an adverse administrative decision by writ of mandate, 'and if the administrative proceeding possessed the requisite judicial character [citation], the administrative decision is binding in a later civil action brought in superior court.'" (*Runyon v. Board of Trustees of California State University* (2010) 48 Cal.4th 760, 773.) The binding nature of a final administrative decision is typically understood as referring to the doctrine of issue preclusion (see, e.g., *Murray v. Alaska Airlines, Inc.* (2010) 50 Cal.4th 860, 867), although some courts of appeal have referred more broadly to both the "issue and claim preclusive effect" or "res judicata" effect of such an adverse decision. (E.g., *Page v. County of Los Angeles County Probation Dept.* (2004) 123 Cal.App.4th 1135, 1142; *Patrick Media Group v. California Coastal Com.* (1992) 9 Cal.App.4th 592, 617.)

Here, the trial court ruled all causes of action asserted by Heinz in his first amended complaint were barred by claim preclusion. That was error for two independent reasons. First, an essential element for application of the doctrine of claim

27

preclusion is that there was a final judgment on the merits in a prior proceeding: "Claim preclusion arises if a second suit involves (1) the same cause of action (2) between the same parties (3) after a final judgment on the merits in the first suit." (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 824; see *Slater v. Blackwood* (1975) 15 Cal.3d 791, 795 ["[a] valid final judgment on the merits in favor of a defendant serves as a complete bar to further litigation on the same cause of action"].) Under California law a "trial court judgment has no preclusive effect until the appellate process is complete." (*Samara v. Matar* (2018) 5 Cal.5th 322, 335; see *Agarwal v. Johnson* (1979) 25 Cal.3d 932, 954; *Favila v. Katten Muchin Rosenman LLP* (2010) 188 Cal.App.4th 189, 223 [entry of a final judgment in the prior action is an essential element for application of the doctrine of claim preclusion].)

In *Page v. Los Angeles County Probation Dept.*, *supra*, 123 Cal.App.4th 1135, relied upon by the trial court, and the cases cited by CalPERS and Anthem in support of the court's ruling on claim preclusion, either no writ of administrative mandamus had been sought by the party filing the civil lawsuit or its petition for writ of administrative mandamus had been decided and all appeals of the adverse decision exhausted. In this case, in contrast, when the trial court ruled claim preclusion barred Heinz's first amended complaint in its entirety, the appellate process for reviewing the CalPERS administrative decision was far from complete; and claim preclusion could not yet be applied. (*Sandoval v. Superior Court* (1983) 140 Cal.App.3d 932, 936 ["California law is settled that *pending* appeal a trial court judgment is not final and will not be given res judicata effect"]; see *Samara v. Matar*, *supra*, 5 Cal.5th at

p. 333 ["[t]he availability of a direct appeal reflects a sensible determination that the process culminating in a trial court's disputed decision is not sufficient to resolve litigation conclusively"]; *Franklin & Franklin v. 7-Eleven Owners for Fair Franchising* (2000) 85 Cal.App.4th 1168, 1174 ["in California the rule is that the finality required to invoke the preclusive bar of res judicata is not achieved until an appeal from the trial court judgment has been exhausted or the time to appeal has expired"]; see generally § 1049 ["[a]n action is deemed to be pending from the time of its commencement until its final determination upon appeal, or until the time for appeal has passed, unless the judgment is sooner satisfied"].)

Second, even when the doctrine of claim preclusion properly applies, it only "prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them." (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896.) For this purpose, California law identifies a single cause of action as "the violation of a single primary right." (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 681; see *Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 797 ["[t]o determine whether two proceedings involve identical causes of action for purposes of claim preclusion, California courts have 'consistently applied the "primary rights" theory'"]; *Slater v. Blackwood*, *supra*, 15 Cal.3d at p. 795 ["California has consistently applied the 'primary rights' theory, under which the invasion of one primary right gives rise to a single cause of action"].)[18] The primary right theory provides "a 'cause of action'

[18] As CalPERS and Anthem observe in their respondents' brief, it is generally true that "a prior judgment between the same parties 'is *res judicata* on matters which were raised or

29

is comprised of a 'primary right' of the plaintiff, a corresponding 'primary duty' of the defendant, and a wrongful act by the defendant constituting a breach of that duty. [Citation.] The most salient characteristic of a primary right is that it is indivisible: the violation of a single primary right gives rise to but a single cause of action." (*Crowley*, at p. 681.)

As the Supreme Court has recognized, "the primary right theory is notoriously uncertain in application." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 395.) That said, the rights Heinz seeks to vindicate in his claims for breach of fiduciary duty, fraud, breach of regulatory obligations and unfair business practices, as well as the wrongful acts he alleges as the bases for those claims, are unquestionably different from the primary right at stake in his straightforward breach of contract action asserting Anthem

---

could have been raised, on matters litigated or litigable.'" (*Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 92-93; accord, *Aerojet-General Corp. v. American Excess Ins. Co.* (2002) 97 Cal.App.4th 387, 402.) However, the doctrine of claim preclusion is focused on splitting a single cause of action or relitigation of the same cause of action on a different legal theory or for different relief: That a plaintiff could have asserted a claim in a prior proceeding under liberal pleading rules for permissive joinder does not necessarily trigger claim preclusion. If a defendant's conduct violated multiple primary rights, it is not prohibited splitting of a cause of action to bring separate actions to recover for the violation of each primary right. (See *Mycogen Corp. v. Monsanto Co.*, *supra*, 28 Cal.4th at p. 897; *Fujifilm Corp. v. Yang* (2014) 223 Cal.App.4th 326, 333-334.) "[A] given set of facts may give rise to the violation of more than one 'primary right,' thus giving a plaintiff the potential of two separate lawsuits against a single defendant." (*Sawyer v. First Financial Corp.* (1981) 124 Cal.App.3d 390, 399.)

misapplied the Allowable Amount provision of the 2008 and 2009 EOC's. (See, e.g., *Sawyer v. First Financial Corp.* (1981) 124 Cal.App.3d 390, 402-403 [second lawsuit alleging fraud and first lawsuit alleging breach of contract involved distinct primary rights; "[s]urely one's breach of contract by failing to pay a note violates a 'primary right' which is separate from the 'primary right' not to have the note stolen," even though "the monetary loss may be measurable by the same promissory note amount, and hence in a general sense the same 'harm' has been done in both cases"]; see also *Fujifilm Corp. v. Yang* (2014) 223 Cal.App.4th 326, 332 [breach of contract and fraudulent transfer causes of action involve different primary rights]; *Brenelli Amedeo, S.P.A. v. Bakara Furniture, Inc.* (1994) 29 Cal.App.4th 1828, 1837 [right to have contractual obligations performed is distinct from the right to be free from tortious behavior preventing collection of a judgment].)[19]

---

[19] Even if Heinz's fraud and breach of fiduciary duty claims were considered to seek redress for the same primary right as his breach of contract cause of action, "[a]n important exception to the general rule of indivisibility of a primary right permits a second action on a different legal theory if the plaintiff was precluded from asserting that theory in the first action because of limitations on the subject matter jurisdiction of the first forum." (*Le Parc Community Assn. v. Workers' Comp. Appeals Bd.* (2003) 110 Cal.App.4th 1161, 1170.) Heinz's attempt to assert these claims in the administrative proceedings was rejected. If that rejection was based on jurisdictional limitations, rather than timeliness, claim preclusion would not bar their litigation in superior court for this reason, as well.

ii. Issue preclusion

Like the doctrine of claim preclusion, the doctrine of issue preclusion generally applies only after a final adjudication. (See, e.g., *Samara v. Matar*, *supra*, 5 Cal.5th at p. 327; *DKN Holdings LLC v. Faerber*, *supra*, 61 Cal.4th at p. 825.) In considering the decision of a judicial or quasi-judicial administrative body in a lawsuit that combines a petition for writ of administrative mandamus with additional claims, as here, however, once the superior court has denied the petition seeking to overturn the agency's decision, the court properly gives binding effect to the adverse administrative findings in the pending action. (See *Johnson v. City of Loma Linda*, *supra*, 24 Cal.4th at p. 76 [referring to "binding," rather than "preclusive" effect of adverse administrative finding that has not been set aside through judicial review procedures]; see also *Sabek, Inc. v. Engelhard Corp.* (1998) 65 Cal.App.4th 992, 998 [finality for purposes of issue preclusion is not invariably the same as the finality essential to claim preclusion]; Rest.2d Judgments, §§ 13, com. g ["[i]n particular circumstances the wisest course is to regard the prior decision of the issue as final for the purpose of issue preclusion without awaiting the end judgment"], 27, com. k ["a litigation may have reached a stage at which issue preclusion is appropriate even though claim preclusion—application of the rules of merger and bar—is not"]; cf. *Raedeke v. Gibraltar Sav. & Loan Assn.* (1974) 10 Cal.3d 665, 671 ["in a case involving both legal and equitable issues, the trial court may proceed to try the equitable issues first, without a jury[;] . . . [and,] if the court's determination of those issues is also dispositive of the legal issues, nothing further remains to be tried by a jury"]; *Orange County Water Dist. v. Alcoa Global Fasteners, Inc.* (2017)

12 Cal.App.5th 252, 355 [same]; see generally *Samara*, at p. 336 [although the trial court's prior finding does not yet satisfy the requirements for issue or claim preclusion, "the court need not forget or ignore the work it has already completed in this litigation"; "it means only that a prior determination by itself does not necessarily, as a matter of law, bind the future one"].)[20]

As the trial court ruled in its order denying the petition for writ of administrative mandamus, Anthem complied with the requirements of the EOC's in determining the Allowable Amount for reimbursement of Dr. Walker's out-of-network nonemergency services and Heinz failed to establish any breach of the implied covenant of good faith and fair dealing. The court properly gave binding effect to that determination and, accordingly, did not err in sustaining the demurrer to Heinz's causes of action for breach of contract and breach of the implied covenant following that ruling.[21] The finding of no breach of contract encompassed by the

[20] The trial court in *Samara v. Matar*, *supra*, 5 Cal.5th 322, had granted summary judgment in favor of one defendant based on the statute of limitations and lack of causation. Although both grounds were challenged on appeal, the court of appeal affirmed the judgment solely on the statute of limitations. The Supreme Court held, because the issue of causation had not been decided on appeal, the trial court's decision on causation was not binding as a matter of law on the second defendant in the litigation. (*Id.* at p. 334.)

[21] The trial court's denial of Heinz's petition for writ of administrative mandamus also precludes his cause of action alleging violations of his right to due process. Any claim the administrative review process deprived Heinz of a fair hearing should have been presented in the first instance in Heinz's writ petition. (See *Conlan v. Bontá* (2002) 102 Cal.App.4th 745, 751-752 [administrative mandamus under section 1094.5 is the

33

order denying the writ petition, however, does not preclude the other causes of action alleged in Heinz's first amended complaint as a matter of law.

### b. *Equitable estoppel*

"The equitable tolling of statutes of limitations is a judicially created, nonstatutory doctrine. [Citations.] It is 'designed to prevent unjust and technical forfeitures of the right to a trial on the merits when the purpose of the statute of limitations—timely notice to the defendant of the plaintiff's claims—has been satisfied.' [Citation.] Where applicable, the doctrine will 'suspend or extend a statute of limitations as necessary to ensure fundamental practicality and fairness.'" (*McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 99 (*McDonald*); accord, *Saint Francis Memorial Hospital v. State Dept. of Public Health* (2020) 9 Cal.5th 710, 719.) "[T]he effect of equitable tolling is that the limitations period *stops running* during the tolling event, and begins to run again only when the tolling event has concluded. As a consequence, the tolled interval, no matter when it took place, is tacked onto the end of the limitations period, thus extending the deadline for suit by the entire length of time during which the

---

appropriate method to inquire into the conduct or result of an administrative proceeding]; *Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1169 [section 1094.5, subdivision (b), authorizes the issuance of a writ of administrative mandate where the agency deprived the petitioner of a fair hearing].) None was, and any claim has been forfeited. (See *Quiles v. Parent* (2018) 28 Cal.App.5th 1000, 1013; *Bank of America, N.A. v. Roberts* (2013) 217 Cal.App.4th 1386, 1398-1399.)

tolling event previously occurred." (*Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 370-371.)

"Broadly speaking, the doctrine applies "'[w]hen an injured person has several legal remedies and, reasonably and in good faith, pursues one.'" [Citations.] Thus, it may apply where one action stands to lessen the harm that is the subject of a potential second action; where administrative remedies must be exhausted before a second action can proceed; or where a first action, embarked upon in good faith, is found to be defective for some reason." (*McDonald*, *supra*, 45 Cal.4th at p. 100.) "[E]quitable tolling today applies when three 'elements' are present: '[(1)] timely notice, and [(2)] lack of prejudice, to the defendant, and [(3)] reasonable and good faith conduct on the part of the plaintiff.' [Citation.] These requirements are designed to 'balanc[e] . . . the injustice to the plaintiff occasioned by the bar of his claim against the effect upon the important public interest or policy expressed by the [operative] limitations statute.'" (*Saint Francis Memorial Hospital v. State Dept. of Public Health*, *supra*, 9 Cal.5th at pp. 724-725; accord, *Tarkington v. California Unemployment Ins. Appeals Bd.* (2009) 172 Cal.App.4th 1494, 1503; see *McDonald,* at p. 102.)

The trial court ruled Heinz provided timely notice for purposes of equitable tolling as to all claims or issues raised in the administrative action.[22] We agree. However, because it ruled (erroneously, as we have explained) that claim and issue preclusion barred all causes of action in the first amended complaint, the court did not address which of Heinz's causes of action were based on claims presented in the administrative proceedings and entitled to the benefit of equitable tolling.

As the court noted, Heinz's causes of action are subject to either three- or four-year statutes of limitations.[23] The CalPERS Board adopted the administrative law judge's proposed decision on March 20, 2017. The order denying Heinz's petition for reconsideration was filed May 22, 2017. Heinz filed his original complaint on June 13, 2017—three weeks after the denial of the

---

[22] Judge Wiley made clear on the record his ruling on equitable tolling was preliminary; Judge Hogue was entitled to address the issue when ruling on the demurrer.

[23] The causes of action for misrepresentation and violation of statutory obligations are subject to three-year statutes of limitations (Code Civ. Proc., § 338, subds. (a) & (d)); the cause of action for unfair business practices to a four-year limitations period (Bus. & Prof. Code, § 17208). The statute of limitations for breach of fiduciary duty is three years or four years, depending on whether the breach is fraudulent or nonfraudulent. (*American Master Lease LLC v. Idanta Partners, Ltd.* (2014) 225 Cal.App.4th 1451, 1479; see *Fuller v. First Franklin Financial Corp.* (2013) 216 Cal.App.4th 955, 963 ["limitations period is three years . . . for a cause of action for breach of fiduciary duty where the gravamen of the claim is deceit, rather than the catchall four-year limitations period that would otherwise apply"].)

36

petition for reconsideration.[24]  Assuming Heinz's various causes of action accrued no earlier than September 2008 when he first became aware of the level of reimbursement for Dr. Walker as a nonpreferred provider, and applying the shorter three-year statute of limitations, any cause of action based on claims raised in the administrative action by July 2011—two years 11 months later—would be subject to equitable tolling and presumptively timely filed, at least for purposes of a viable pleading.  (See *Ivanoff v. Bank of America, N.A.* (2017) 9 Cal.App.5th 719, 726 ["'a demurrer based on an affirmative defense will be sustained only where the face of the complaint discloses that the action is necessarily barred by the defense'"]; *Casterson v. Superior Court* (2002) 101 Cal.App.4th 177, 183 [same].)

In his June 15, 2009 appeal of Anthem's denial of his claims, Heinz asserted Anthem and CalPERS had misrepresented how reimbursement for nonemergency out-of-network services would be determined.  In his first amended appeal letter, dated April 4, 2011, Heinz attempted to add claims of breach of fiduciary duty and breach of statutory (regulatory) obligations to the existing appeal.  If equitable tolling began on those dates, Heinz's causes of action for misrepresentation, breach of fiduciary duty and breach of statutory and regulatory duties, as well as his causes of action for a traditional writ of mandate and unfair business practices to the extent those are based on the conduct underlying the other claims, were sufficiently pleaded to survive a demurrer.[25]

---

[24]    All of these dates are detailed in the first amended complaint.

[25]    CalPERS and Anthem do not argue on appeal they were prejudiced by Heinz's delay in asserting his individual claims or

To be sure, CalPERS determined Heinz's fraud, breach of fiduciary duty and statutory violation claims were not properly determined in the administrative proceedings.[26]  But pursuit of a viable remedy is not required:  "[E]ven in cases where a party seeking tolling pursued an alternative remedy, [the Supreme Court has] concluded that pursuit of a remedy 'embarked upon in good faith, [yet] found to be defective for some reason,' doesn't foreclose a statute of limitations from being tolled."  (*Saint Francis Memorial Hospital v. State Dept. of Public Health, supra*, 9 Cal.5th at p. 725.)  At this preliminary stage of the case, it cannot be said as a matter of law that CalPERS and Anthem did not have timely notice of Heinz's intention to pursue those issues if the administrative appeal process did not resolve his claims in a satisfactory manner or that they were prejudiced in their ability to gather evidence to defend against those claims. Nothing more is required to defeat the demurrer on this ground. (See *id.* at p. 726 ["[w]hen considering whether a plaintiff provided timely notice, courts focus on whether the party's actions caused the defendant to be 'fully notified within the

that he did not act reasonably and in good faith with respect to bringing them.  Their argument that, even if some of Heinz's individual claims may be subject to equitable tolling, it would be prejudicial to permit him to pursue those claims on behalf of a class of plan members was not made in their demurrer and is not properly before us.

[26]    CalPERS and Anthem did not demur to any cause of action in the first amended complaint on the ground Heinz had failed to exhaust his administrative remedies.

[statute of limitations] of plaintiffs' claims and their intent to litigate'"].)[27]

### c. *CalPERS's remaining arguments*

In its demurrer CalPERS argued Heinz's failure to timely file under the Government Claims Act precluded his causes of action against it and it was entitled to governmental immunity with respect to his breach of fiduciary duty claim because negotiation of the terms of the EOC's with Anthem was discretionary activity within the meaning of Government Code sections 815.2, subdivision (b), and 820.2.[28] The trial court did

---

[27] Although the demurrer should have been overruled as to Heinz's causes of action for misrepresentation, breach of fiduciary duty, breach of regulatory duties, traditional writ of mandate and unfair business practices, in the context of this case, unjust enrichment (Heinz's third cause of action) and equitable relief (his 11th cause of action) are not properly pleaded as separate causes of action, rather than as remedies for other alleged unlawful acts. (See, e.g., *McBride v. Boughton* (2004) 123 Cal.App.4th 379, 388 [construing "purported cause of action for unjust enrichment as an attempt to plead a cause of action giving rise to a right to restitution"; "[t]here are several potential bases for a cause of action seeking restitution," including "where the defendant obtained a benefit from the plaintiff by fraud, duress, conversion, or similar conduct"].) Similarly, unconscionability (the 10th cause of action) is not a cause of action. (Cf. *De La Torre v. CashCall, Inc*. (2018) 5 Cal.5th 966, 980 [Business & Professions Code section 17200 provides mechanism for policing unconscionable loan practices].)

[28] Government Code section 820.2 states, "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Government

not address either of those defenses in sustaining the demurrer without leave to amend.

In light of our decision on equitable estoppel, it is appropriate for the superior court to expressly rule in the first instance on Heinz's first amended petition for an order relieving petitioner from the provisions of Government Code section 945.5, thereby determining whether a timely claim under the Government Claims Act was required for the surviving causes of action; if so, whether Heinz satisfied that requirement; and, if not, whether his failure to timely file is excused on any of the grounds set forth in his petition.

As for CalPERS's immunity defense to the cause of action for breach of fiduciary duty, as CalPERS contends, the provisions in the PPO plans authorizing Anthem to pay reduced levels of reimbursement for out-of-network providers are designed to encourage use of preferred providers, thereby permitting CalPERS to better control healthcare costs for its members (see *Orthopedic Specialists*, *supra*, 228 Cal.App.4th at p. 648)—a basic policy decision subject to governmental immunity. (See *Johnson v. State of California* (1968) 69 Cal.2d 782, 796.)[29]  However,

Code section 815.2, subdivision (b), extends that discretionary act immunity to the public entity whose employee's conduct is at issue: "Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability."

[29]     The Supreme Court in *Johnson* held Government Code section 820.2 provides immunity for "basic policy decisions," but not "for the ministerial implementation of that basic policy." (*Johnson v. State of California, supra,* 69 Cal.2d at p. 796.)  The Court explained this distinction might also be characterized as

40

although far from a model of pleading, Heinz's first amended complaint also alleges that CalPERS breached its fiduciary duty to its members by failing to adequately oversee Anthem's administration of the PPO's—the ministerial implementation of a basic policy not subject to governmental immunity. (*Ibid.*) Those allegations are sufficient to defeat CalPERS's demurrer on this ground.

---

"between the 'planning' and 'operational' levels of decision-making." (*Id.* at p. 794.) It noted "[a]ny wider judicial review . . . would place the court in the unseemly position of determining the propriety of decisions expressly entrusted to a coordinate branch of government." (*Id.* at p. 793.) Using this analysis the Court held the decision to place a youth with homicidal tendencies who was on parole in Mrs. Johnson's foster home was a "basic policy decision," but the decision whether to warn her of his violent propensities was ministerial. (*Id.* at p. 796.) "[A]lthough a basic policy decision (such as standards for parole) may be discretionary and hence warrant governmental immunity, subsequent ministerial actions in the implementation of that basic decision still must face case-by-case adjudication on the question of negligence." (*Id.* at p. 797.)

## DISPOSITION

The judgment of dismissal is reversed.  The order denying the petition for writ of administrative mandamus is affirmed.  On remand the trial court is directed to enter a new order overruling CalPERS and Anthem's demurrer to the causes of action for breach of fiduciary duty (second cause of action), misrepresentation (fourth cause of action), traditional writ of mandate (fifth cause of action), unfair business practices (sixth cause of action) and breach of statutory duties (eighth cause of action) and sustaining the demurrer to all other causes of action without leave to amend.  The parties are to bear their own costs on appeal.

PERLUSS, P. J.

We concur:

FEUER, J.

McCORMICK, J.*

---

*     Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

42

## PAYMENT AND MEMBER COPAYMENT RESPONSIBILITY

The following example illustrates the Member's reduced out-of-pocket amount when receiving services from a Preferred Provider.

### Payment Example

**Important Note:** You are required to pay any charges for services provided by a Non-Preferred Provider or an other provider which are in excess of the allowable amount, plus all charges for non-covered services.

| | Preferred Provider | Non-Preferred Provider |
|---|---|---|
| **Billed Charge** – the amount the provider actually charges for a covered service provided to a Member | $100,000 | $100,000 |
| **Allowable Amount** – the allowance or negotiated amount under the Plan for service provided (see definition on page 91). Note: This is only an example. Allowable amount varies according to procedure and provider of service. | $35,000 | $35,000 |
| **Calendar Year Deductible** – the amount of Allowable Amount the Member is responsible to pay each calendar year before Plan benefits are payable | $500 | $500 |
| **Copayment** – the percentage of Allowable Amount the Member pays after any applicable deductible is satisfied | $2,000 (10% of Allowable Amount until maximum copayment met) | $13,800 (40% of Allowable Amount; maximum copayment is not applicable) |
| **Plan Payment** – the percentage of Allowable Amount the Plan pays after any applicable deductible and copayment are subtracted | $32,500 (90% of Allowable Amount until maximum copayment met, then 100%) | $20,700 (60% of Allowable Amount; maximum copayment is not applicable) |
| **Remaining Balance**– billed charges exceeding Allowable Amount that the Member is responsible to pay | $0 (Preferred Provider cannot bill the Member for the difference between Allowable Amount and Billed Charges) | $65,000 (Non-Preferred Provider can bill the Member for the difference between Allowable Amount and Billed Charges) |
| **Total Amount the Member is Responsible To Pay** | $2,500 | $79,300 |